UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

COLDER PRODUCTS COMPANY,

Plaintiff,

v.

NEOLOGIC SOLUTIONS, INC. and FRESH WATER SYSTEMS, INC.,

Defendants.

FRESH WATER SYSTEMS, INC. and NEOLOGIC SOLUTIONS, INC.,

Counter Plaintiffs,

v.

COLDER PRODUCTS COMPANY,

Counter Defendant.

Case No. 24-CV-3486 (PJS/SGE)

ORDER

---

David Lurie, Marlow Svatek, Nicholas H. Callahan, and Roger H. Stetson, BARACK FERRAZZANO KIRSCHBAUM & NAGELBERG; Michael Educate, THOMPSON COBURN LLP, for plaintiff/counter defendant.

Alexander D. Klein and Mark R. Bradford, BRADFORD ANDRESEN NORRIE & CAMAROTTO; Olivia Liz-Fonts, BASSFORD REMELE PA; Christopher T. Ruska, NILAN JOHNSON LEWIS PA, for defendants/ counter plaintiffs.

Plaintiff/counter defendant Colder Products Company ("CPC") manufactures various devices that are used to join plastic tubes. CPC distributed its products through

defendants/counter plaintiffs Fresh Water Systems, Inc. and its successor NeoLogic Solutions, Inc. ("NeoLogic") under a contract executed in 2012. More than a decade later, the relationship soured, and CPC terminated the agreement.

CPC then brought this breach-of-contract action, alleging that NeoLogic owes it about $1.7 million in unpaid invoices. NeoLogic counterclaimed, alleging breach of contract, breach of the implied duty of good faith and fair dealing, and tortious interference with prospective business advantage. CPC now moves for summary judgment on all claims and counterclaims and moves to exclude the testimony of NeoLogic's expert. NeoLogic moves for partial summary judgment on one of its counterclaims. For the reasons that follow, CPC's motions are granted in part and denied in part, and NeoLogic's motion is denied in full.

## I. BACKGROUND

### *A. CPC's Business Model*

CPC sells "couplings, fittings and connectors for plastic tubing." Gerst Decl. ¶ 3. Its products are used in the beverage, medical, and thermal-management industries, among others. Harmon Decl. Ex. 12 at 11. CPC sells its products both directly to end users and indirectly through a "network of distributors." Gerst Decl. ¶ 3.

CPC calls its distributors "Channel Partners." *Id.* There are two types of Channel Partners:

The first and most common type of Channel Partner is a traditional distributor that serves a relatively concentrated geographic area—such as a single state—usually out of a brick-and-mortar facility. *Id.* ¶ 4; *see also* Bradford Decl. Ex. 2, Hornbuckle Dep. at 17:13–18; Harmon Decl. Ex. 12 at 20–23. CPC works "intensively" with its traditional distributors to develop "high-touch, hands-on customer relationships" in their respective territories. Gerst Decl. ¶ 4. The Court will refer to Channel Partners in this category as "Distributors."

The second and less common type of Channel Partner is a catalog distributor. *Id.*; *see also* Harmon Decl. Ex. 12 at 24. The Court will refer to Channel Partners in this category as "Catalogers." Catalogers often sell CPC products online, from the Cataloger's existing inventory, in a wide (even international) geographic area, and to customers who are complete strangers. Gerst Decl. ¶ 4; Bradford Decl. Ex. 2, Hornbuckle Dep. at 17:20–24 (Catalogers "do not do a lot of work to build the business as a whole"). CPC estimates that, of its nearly 200 Channel Partners around the globe, *see* Harmon Decl. Ex. 12 at 6, fewer than ten are Catalogers, *see* Harmon Reply Decl. Ex. 1, Gerst Dep. at 3.

Both types of Channel Partners may place orders with CPC pursuant to a published "discount schedule."[1] Although the "base price" or "list price" of CPC

---

[1]After a Channel Partner submits a purchase order pursuant to the discount
(continued...)

products (i.e., the "sticker price" charged to end users) is the same for both types of Channel Partners, the discount schedules (i.e, the amounts that the Channel Partners pay to CPC) differ. Bradford Decl. Ex. 1, Gerst Dep. at 25:19–26:5 (agreeing that "price is different than discount"). The discount schedules for Distributors provide "[s]caled volume discounts"—i.e., as volume increases, so does the size of the discount. Harmon Decl. Ex. 12 at 23; Gerst Decl. ¶ 7. These discounts "allow [D]istributors to significantly invest in . . . CPC's overall . . . growth strategy." Harmon Decl. Ex. 12 at 23. Because Catalogers are not as involved in developing customer relationships—and thus their work is far less labor intensive—Catalogers receive a less favorable discount schedule. Gerst Decl. ¶ 4. The Cataloger discount is "[f]ixed"—" i.e., 38%"—no matter the volume. Harmon Decl. Ex. 12 at 26.

A Distributor may submit a request for quote ("RFQ") to CPC seeking an additional "bespoke" discount. Gerst Decl. ¶ 8. (It is unclear whether CPC accepts RFQs from Catalogers.[2]) CPC may, at its discretion, approve RFQs for high-volume orders (i.e., over 2,500 items), for especially loyal customers, or for new customers with

[1](...continued)
schedule, CPC sends an acknowledgment form and invoice to confirm the order. Gerst Decl. ¶ 11, Ex. 3.

[2]*Compare* Hearing Tr. at 98:10–12 (counsel for CPC representing that Catalogers *can* ask for a bespoke discount but it is "not something that comes up as often as with traditional distributors"), *with* Harmon Decl. Ex. 12 at 23–26 (listing the potential for high-volume "quoting" as an option for Distributors but not for Catalogers).

whom CPC is trying to build a long-term relationship. *Id.*; *see also* Harmon Decl. Ex. 12 at 23 (describing that CPC gives custom quotes for orders of "higher volumes"). If CPC approves the RFQ, CPC will provide the Distributor with a quote. Gerst Decl. ¶ 10, Ex. 2. If the quote is satisfactory, the Distributor will submit a purchase order. *Id.* ¶ 11. CPC accepts the purchase order by sending the Distributor an acknowledgment and an invoice. *Id.* ¶ 11, Ex. 3.[3]

When a Distributor submits an RFQ, the Distributor must identify the intended end user of the products that are the subject of the RFQ. *Id.* ¶ 8. CPC's internal policy is to decline an RFQ from a Distributor—a decision referred to as a "no quote"—when another Channel Partner or CPC itself has a pre-existing relationship with the intended end user. *Id.* ¶ 9; Bradford Decl. Ex. 11; Lemmetti Decl. ¶ 6, Exs. 3, 4. This is to keep one Channel Partner from "poaching" a customer of another Channel Partner. Gerst Decl. ¶ 9.

### *B. NeoLogic and CPC*

Fresh Water Systems, Inc. became a Channel Partner in 2012 when it entered into a "Distributor Agreement" with CPC. Gerst Decl. ¶ 5, Ex. 1. In 2022, NeoLogic took over Fresh Water Systems, Inc.'s relationship with CPC. *Id.* ¶ 6; Norvell Decl. ¶ 7.

---

[3]All CPC purchase orders, quotes, and order acknowledgments are subject to CPC's terms and conditions of sale. Gerst Decl. ¶ 12, Ex. 4.

NeoLogic and CPC continued operating under the 2012 Distributor Agreement.

Norvell Decl. ¶ 7.

The Distributor Agreement provides in relevant part as follows:

- That NeoLogic is an "authorized CPC distributor" with a "non-exclusive" appointment to purchase and resell CPC products in North America.
- That NeoLogic will pay CPC invoices "on a Net 30 day basis."
- That CPC will "expedite deliveries to the extent possible," but will not be liable "for losses or damages due to any delays in filling orders."
- That "[p]rices for CPC products shall be as published by CPC from time to time" and are "subject to change without notice."
- That each party has the right to terminate the Agreement within 30 days if the other party commits an unremedied breach or on 90 days' written notice "for any reason, with or without cause."
- That upon termination of the Agreement, NeoLogic relinquishes its right to use CPC branding and to "sell . . . and distribute products on behalf of CPC."
- That upon termination of the Agreement, NeoLogic has the "option to return within 45 days of termination all new, unused and current standard catalog merchandise in Distributor's inventory, according to the return procedure established by CPC from time to time."
- That the Agreement is "binding upon and shall insure [to] the benefit of the parties, and their respective successors in interest."
- And that "in the event of any breach by Distributor, or in the event of apparent danger of such breach, CPC shall be entitled, in addition to any other legal or equitable remedies available to CPC, to an injunction to restrain the violation of any and all such portions of this Agreement by

> Distributor and to its reasonable attorney's fees and costs incurred in enforcing any provision of this Agreement."

Gerst Decl. Ex. 1.

From the inception of their relationship, CPC treated NeoLogic as a Distributor (rather than as a Cataloger). For example, CPC offered NeoLogic the advantageous Distributor discount schedule (under which the discount rate was flexible and based on volume), not the less advantageous Cataloger discount schedule (under which the discount rate was fixed no matter the volume). Gerst Decl. ¶ 17; Bradford Decl. Ex. 6. NeoLogic also frequently submitted RFQs to CPC seeking bespoke discounts for high-volume orders. Gerst Decl. ¶ 10, Ex. 2; Norvell Decl. ¶ 8. According to NeoLogic's president, his company's access to the Distributor discount schedule was necessary for it to effectively compete in the marketplace. Norvell Decl. ¶ 3.

Although CPC treated NeoLogic as a Distributor, NeoLogic actually functioned more like a Cataloger. NeoLogic was not a traditional, high-touch, local-market Distributor. To the contrary, NeoLogic sold products over the Internet, and its market was the entire North American continent. Gerst Decl. ¶ 17, Ex. 1. Moreover, NeoLogic maintained a large inventory of CPC products—"safety stock as well as stock to satisfy its projected market share of its territorial demand"—and often filled customer orders from its existing inventory rather than by ordering the requested products from CPC. Norvell Decl. ¶ 4.

In 2022, shortly after NeoLogic replaced Fresh Water Systems, Inc. as a party to the Distributor Agreement, the relationship between NeoLogic and CPC began to deteriorate. Increasingly, NeoLogic submitted RFQs seeking discounts over and above those provided by the Distributor discount schedule. Norvell Decl. ¶ 8; Gerst Decl. ¶ 21. And increasingly, CPC responded to NeoLogic's RFQs by "no-quoting"—that is, by saying "no." Norvell Decl. ¶ 9; Gerst Decl. ¶¶ 25, 26; *see also* Harmon Decl. Ex. 13; Bradford Decl. Ex. 11. According to NeoLogic, CPC's "no-quotes," as well as CPC's delays in responding to RFQs, caused NeoLogic to lose a substantial amount of business. Lemmetti Decl. ¶¶ 3, 4; Norvell Decl. ¶ 9; Ramirez Decl. ¶ 13.

For its part, CPC grew concerned about what it regarded as sharp practices engaged in by NeoLogic. Specifically, CPC determined that many end users identified on NeoLogic RFQs were pre-existing customers of other Channel Partners. Gerst Decl. ¶ 22. Put differently, CPC determined that NeoLogic was using RFQs to "poach" customers from other Channel Partners whose pricing from CPC was not as favorable. Gerst Decl. ¶ 22; Harmon Decl. Ex. 9. CPC also suspected NeoLogic of abusing the RFQ process by falsely identifying a "nominal" customer on RFQs when, in fact, NeoLogic was simply amassing inventory at favorable prices. Gerst Decl. ¶ 22. Having a large inventory of heavily discounted CPC products would, of course, put NeoLogic in

position to poach customers from other Distributors and Catalogers—potentially without CPC's knowledge.[4]

On March 24, 2023, CPC acted on these concerns by formally classifying NeoLogic as a Cataloger (rather than as a Distributor). Gerst Decl. ¶¶ 19, 22, 23, 30, Ex. 6. CPC's letter informing NeoLogic of the change confirmed that, like any Cataloger, NeoLogic would have to use "the STD [i.e., Cataloger] discount schedule" for future orders. Gerst Decl. Ex. 6. CPC also informed NeoLogic that, although CPC would honor active quotations until their expiration dates, in the future NeoLogic would have to purchase products pursuant to the Cataloger discount schedule. *Id.*[5] In other words, CPC told NeoLogic that any future RFQs would be rejected. CPC attempted to form a new contract with NeoLogic reflecting these changes, but that contract was never finalized. Gerst Decl. Ex. 6 (letter referring to "New Cataloger Agreement"); Bradford Decl. Ex. 1, Gerst Dep. at 22:25–24:16 ("There was an attempt to

[4]NeoLogic vigorously disputes the "poaching" allegations and argues that CPC was well aware of—and indeed benefitted from—its practice of maintaining a large inventory of CPC products. *E.g.*, Norvell Decl. ¶ 6; Bradford Decl. Ex. 8 (CPC employee referring via email to FreshWater Solutions, Inc. as having "bailed . . . out folks durring [sic] pandemic supply shortages").

[5]Prior to implementing the formal change, CPC had treated NeoLogic as a Cataloger on at least one occasion. Norvell Decl. ¶ 11; Bradford Decl. Ex. 6 (internal CPC email dated January 26, 2023 stating that it "looks like [CPC] communicated some different discount schedules (catalog related) to NeoLogic and it is causing issues"), Ex. 12 (January 26, 2023 email correspondence between NeoLogic and CPC regarding CPC's use of Cataloger pricing for NeoLogic orders).

put a new agreement in place."). The un-executed Cataloger-specific agreement for NeoLogic would have been the first and only of its kind. Harmon Reply Decl. Ex. 1, Gerst Dep. at 3.[6]

*C. Termination*

For NeoLogic, the switch from Distributor to Cataloger was the "death knell for [its] ability to sell CPC products." Norvell Decl. ¶ 12; *see also* Harmon Decl. Exs. 17, 19. NeoLogic's president instructed staff not to pay CPC invoices "until the situation . . . could be resolved." Norvell Decl. ¶ 13. NeoLogic also asked CPC to delay delivering (and thus invoicing for) products that NeoLogic had earlier ordered but that, due to CPC's delays in fulfilling the orders, NeoLogic no longer needed (because the original customers had bought products elsewhere). Lemmetti Decl. ¶ 5 (describing that NeoLogic asked CPC to "delay product delivery (and thus invoicing) so NeoLogic could try to arrange for different purchasers").[7] By late 2023, NeoLogic had refused to

[6]Although the record is not entirely clear, it seems that other Catalogers entered into what were labeled as "Distributor Agreements." *See* Doyon Decl. ¶¶ 3–5. In fact, multiple Catalogers apparently operate under Distributor Agreements that are substantively identical to the Distributor Agreement that governed the relationship between CPC and NeoLogic. *Id.* ¶ 4; *but see* Hearing Tr. at 15:1–22 (stating that "catalogers and distributors oftentimes receive different agreements").

[7]The testimony of NeoLogic employees is inconsistent as to whether NeoLogic asked to cancel any orders for which it withheld payment, or only requested that CPC delay delivery and invoicing. *Compare* Lemmetti Decl. ¶ 5 (discussing the "invoices for which CPC claims nonpayment" and asserting that "NeoLogic was not asking to cancel

(continued...)

pay $1,664,127 that it owed CPC for products that had been delivered to NeoLogic. Gerst Decl.¶ 27, Ex. 7; Harmon Decl. Ex. 18.

Needless to say, CPC was unhappy about not being paid for almost $1.7 million in merchandise. On January 23, 2024, CPC sent NeoLogic a Notice of Termination, Notice of Default, and summary of the unpaid balance. Gerst Decl.¶ 29, Ex. 8. On March 7, 2024, NeoLogic sent CPC a post-termination letter requesting that CPC repurchase certain products and discussing NeoLogic's desire to continue to sell the CPC products that remained part of NeoLogic's existing inventory. *Id.* ¶ 31, Ex. 9. At the time of termination, NeoLogic possessed nearly $10 million in CPC products in its inventory. Ramirez Decl. ¶ 14; Harmon Decl. Ex. 20.

CPC refused to repurchase any of the products that NeoLogic attempted to return. Gerst Decl. ¶ 32. Eventually, however, NeoLogic was able to sell approximately $4 million of CPC goods from its inventory. Harmon Decl. Ex. 20. CPC filed this lawsuit on August 29, 2024. ECF No. 1.

---

[7](...continued)
orders"), *with* Ramirez Decl. ¶ 13 (NeoLogic "requested in mid-2023 that CPC cancel $540,000 in outstanding purchase orders. Those purchase orders are part of CPC's affirmative claim against NeoLogic.").

## II. ANALYSIS

### *A. Legal Standard*

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it could affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* When ruling on a summary-judgment motion, the Court views the record in the light most favorable to the nonmoving party and draws all reasonable inferences in its favor. *Wobig v. Safeco Ins. Co. of Ill.*, 40 F.4th 843, 847 (8th Cir. 2022).

### *B. CPC's Claim*

CPC seeks summary judgment on its breach-of-contract claim (Count I), which alleges that NeoLogic owes CPC nearly $1.7 million in unpaid invoices for products that NeoLogic accepted and, in some cases, resold. NeoLogic concedes that it did not pay for the products. Still, NeoLogic contends that a prior breach of the Distributor Agreement by CPC creates a triable issue on whether and to what extent NeoLogic was entitled to withhold payment.

Under Minnesota law,[8] a seller's prior breach does not excuse a buyer from paying for goods that it accepts. *See Heating & Air Specialists, Inc. v. Jones*, 180 F.3d 923, 932 (8th Cir. 1999) ("The U.C.C. contains no provision relieving a buyer of [the obligation to pay for goods] because of a breach that is unrelated to the goods or to their shipment."); Minn. Stat. § 336.2-607(1) ("The buyer must pay at the contract rate for any goods accepted."); *P.T. Medisafe Techs. v. Preventive Care, Inc.*, No. 14-CV-0974 (JNE/FLN), 2016 WL 1192659, at *5 (D. Minn. Mar. 28, 2016) (holding that a "prior breach does not abrogate [a party's] statutory obligation to pay for goods accepted" (citation omitted)). If NeoLogic accepted the goods, then it must pay for the goods.[9] It's that simple.

At the hearing, NeoLogic argued—for the first time—that it never accepted the goods for which it withheld payment. Hearing Tr. at 21:25–23:4, 109:17–7. Federal courts generally decline to entertain issues raised by a party for the first time at oral argument, and thus the Court rejects NeoLogic's argument on that basis. *See Anderson*

---

[8]Minnesota law governs the Distributor Agreement. *See* Gerst Decl. Ex. 1 at 5; *see also* Minn. Stat. § 336.2-102 (incorporating Article 2 of the Uniform Commercial Code ("U.C.C.") that "applies to transactions in goods").

[9]NeoLogic emphasizes that it asked CPC to cancel (or at least delay invoicing for) orders for products it no longer needed due to CPC's delays. But NeoLogic cannot point to anything in the record that obligated CPC to agree to its request. To the contrary, the Distributor Agreement explicitly provided that "CPC shall have no liability for losses or damages due to any delays in filling orders." Gerst Decl. Ex. 1 at 1.

*v. Rugged Races LLC*, 496 F. Supp. 1270, 1285 n.11 (D. Minn. Oct. 26, 2020). Moreover, even if the Court allowed NeoLogic to ambush CPC in this way, the record contains no evidence supporting NeoLogic's tardy argument and much evidence contradicting it.

"[A] buyer who does not reject goods is presumed to accept them and is liable for the contract price . . . ." *TC/Am. Monorail, Inc. v. Custom Conveyor Corp.*, 822 N.W.2d 812, 817 (Minn. Ct. App. 2012) (citations omitted), *rev'd on other grounds*, 840 N.W.2d 414 (Minn. 2013); *see also* Minn. Stat. § 336.2-606(1)(c) (providing that "any act inconsistent with the seller's ownership" of goods constitutes acceptance by buyer). Far from rejecting the goods, NeoLogic took delivery of them, stored them in its warehouse, and went about marketing them to third parties. Such an "admitted and unexplained retention" of goods is plainly an acceptance. *Pettibone Minn. Corp. v. Castle*, 247 N.W.2d 52, 53 (Minn. 1976).

Not only that, but NeoLogic succeeded in *reselling* many of the goods that it now says it never accepted. It is difficult to understand how NeoLogic could argue that it did not "accept" goods that it accepted, put in its warehouse, and later sold to others. *See id.* ("The sale by defendant of the machinery to others was an act inconsistent with the seller's ownership." (cleaned up) (citing Minn. Stat. § 336.2-606(1)(c))); *see also Nw. Airlines, Inc. v. Aeroservice, Inc.*, 172 F. Supp. 2d 1189, 1189 (D. Minn. 2001) ("[A] seller

has no obligation to attempt to . . . mitigate damages for goods which have been accepted by the buyer.”).

NeoLogic next urges that any amount it owes for the unpaid invoices should be offset by any amount it recovers from CPC on its counterclaims. A party may “deduct all or any part of the damages resulting from any breach of contract from any part of the price still due *under the same contract*.” Minn. Stat. § 336.2-717 (emphasis added). Here, though, NeoLogic breached a series of invoices, each of which was its own standalone contract. *See Ind. Lumber & Plywood, Inc. v. Cherry Tree Cabinets, Inc.*, No. A09-648, 2010 WL 155370, at *2 (Minn. Ct. App. Jan. 19, 2010) (“[E]ach order and resulting invoice . . . constitutes a separate contract.”). Any damages that CPC may owe NeoLogic for breaching the *Distributor Agreement* are therefore irrelevant to NeoLogic’s liability for breaching the *invoices*. For these reasons, the Court holds as a matter of law that NeoLogic is liable to CPC for $1,664,127.[10]

---

[10]CPC is also entitled to recover prejudgment interest. *See Moore v. C.H. Robinson Worldwide, Inc.*, No. 20-CV-0252 (PJS/ECW), 2025 WL 3776810, at *1 (D. Minn. Dec. 31, 2025) (explaining that, under Minnesota law, prejudgment interest is recoverable from the time that the party’s claim accrued if the party’s damages were readily ascertainable either by computation or by reference to generally recognized standards (citing *Grandoe v. Gander Mountain Co.*, 761 F.3d 876, 889–90 (8th Cir. 2014)).

CPC argues that it is entitled not only to these damages, but also to the attorney's fees and costs that it incurred in recovering these damages. When NeoLogic failed to timely pay the invoices, NeoLogic breached not only the individual invoices, but also the Distributor Agreement, in which NeoLogic had promised to pay for "CPC products . . . on a Net 30 day basis." Gerst Decl. Ex. 1 at 2. The Distributor Agreement provides that:

> [I]n the event of any breach by Distributor, or in the event of apparent danger of such breach, CPC shall be entitled, in addition to any other legal or equitable remedies available to CPC, [1] to an injunction to restrain the violation of any and all such portions of this Agreement by Distributor and [2] to its reasonable attorney's fees and costs incurred in enforcing any provision of this Agreement.

Gerst Decl. Ex. 1 at 5 (bracketed numbers added).

NeoLogic interprets this fee-shifting provision to mean that CPC could recover only fees incurred in pursuing an *injunction*, not fees incurred in pursuing *damages*. But that is not what the provision says. By using the word "to" twice, the provision emphasizes that CPC is entitled to two distinct remedies "in addition to" damages: first, an injunction preventing future breaches, and second, the reasonable fees and costs that it "incurred in enforcing any provision of th[e] Agreement." *Id.*

NeoLogic argues that, if the fee-shifting provision does apply, a jury must decide the amount of fees. ECF No. 56 at 41 n.20 (citing *United Prairie Bank-Mountain Lake v.*

*Haugen Nutrition & Equip., LLC*, 813 N.W.2d 49, 59 (Minn. 2012)). Once again, NeoLogic is incorrect. Rule 54(d)(2)(A) of the Federal Rules of Civil Procedure provides that "[a] claim for attorney's fees and related nontaxable expenses must be made by motion unless the substantive law requires those fees to be proved at trial as an element of damages." In *Wiley v. Mitchell*, the Eighth Circuit explained that when fees are incurred for work done on a breach-of-contract claim and the recoverability of those fees is contingent on the outcome of that claim, then fees are not "an element of damages" that must be determined by a jury. 106 F. App'x 517, 522–23 (8th Cir. 2004) (per curiam); *see also Nelson v. Frana Cos.*, No. 13-CV-2219 (PJS/SER), 2017 WL 2683957, at *1 (D. Minn. June 21, 2017) (explaining this distinction).

That is exactly the case here. CPC is seeking fees for its work in litigating its breach-of-contract claim—and, in order to be entitled to those fees, CPC had to prevail on the merits. The fees sought here are not part of the *damages* that CPC suffered as a result of NeoLogic's breach—i.e., as a result of NeoLogic's failure to pay the invoices. Rather, the fees sought here are the fees that CPC paid its attorneys to *recover*

*compensation* for those damages.[11] Thus, the Court (not a jury) will decide the amount of fees and costs to which CPC is entitled pursuant to Fed. R. Civ. P. 54(d)(2).

*C. NeoLogic's Counterclaims*

CPC seeks summary judgment on NeoLogic's breach-of-contract counterclaim (Count I), arguing that it fails as a matter of law because (1) NeoLogic was not entitled to order products pursuant to the Distributor discount schedule; (2) NeoLogic was not entitled to return products to CPC following the termination of the Distributor

[11]Judge John. R. Tunheim provided an example of when attorneys fees *would* be part of the damages sustained as a result of a breach of contract:

> [I]f a law firm were to bill a client for fees incurred for the law firm's work on one of the client's transactions, and then the client failed to pay and the law firm sued the client for breach of contract, then the attorney's fees would be part of the damages, and an element of the claim; the fees would not be sought as prevailing-party fees for the litigation itself.

*Nat'l Union Fire Ins. Co. of Pittsburgh v. Donaldson Co.*, No. 10-CV-4948 (JRT/TNL), 2016 WL 4186930, at *5 (D. Minn. Aug. 8, 2016) (citations omitted).

Agreement; and (3) NeoLogic did not suffer any damages.[12] NeoLogic seeks partial summary judgment on the post-termination-returns issue.

1. Discount Structure

NeoLogic claims that CPC breached the Distributor Agreement when it classified NeoLogic as a Cataloger—and thus, as a practical matter, raised the prices that NeoLogic had to pay for CPC products. CPC argues that NeoLogic's claim fails because the Distributor Agreement gave CPC the right to change "prices for [its] products as published from time to time"—and to do so "without notice." Gerst Decl. Ex. 1 at 2. The Court was initially inclined to agree with CPC. But after hearing extensive oral argument and carefully reviewing the record in the light most favorable to NeoLogic,

---

[12]CPC also moves for summary judgment on NeoLogic's claims for breach of the implied covenant of good faith and fair dealing and tortious interference with economic advantage.

The Court will grant CPC's motion on the implied-covenant claim (Count II) because Minnesota law does not recognize an independent cause of action for breach of the implied covenant. Instead, "the doctrine of good faith merely directs a court towards interpreting contracts within the commercial context in which they are created, performed, and enforced, and does not create a separate duty of fairness and reasonableness which can be independently breached." Minn. Stat. § 336.1-304, U.C.C. cmt. 1; *see also Grandoe Corp. v. Gander Mountain Co.*, No. 11-CV-0947 (PJS/FLN), 2012 WL 3430735, at *2 n.2 (D. Minn. Aug. 14, 2012).

NeoLogic concedes that the Court can dismiss its tortious-interference claim (Count III), so the Court will do so. *See* ECF No. 56 at 27 n.13.

the Court concludes that the parties' course of performance under the Distributor Agreement creates a jury question about their rights and obligations.

NeoLogic does not argue that the *language* of the Distributor Agreement gives it the right to purchase products under the Distributor discount schedule rather than the Cataloger discount schedule. Rather, NeoLogic argues that a "decade-long course of performance" created such a right. ECF No. 56 at 25. Under the U.C.C., "course of performance . . . is relevant to ascertaining the meaning of the parties' agreement, may give particular meaning to specific terms of the agreement, and may supplement or qualify the terms of the agreement." Minn. Stat. § 336.1-303(d). A course of performance must be "construed whenever reasonable as consistent" with the express terms of an agreement. *Id.* § 336.1-303(e); *see also id.* § 336.2-202 (contract terms "may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented . . . by course of performance"). Only if such a construction is *unreasonable* do "express terms prevail over course of performance." *Id.* § 336.1-303(e)(1); *see also Hilo Prods., Inc. v. Target Corp.*, 709 F. Supp. 3d 721, 729 n.2 (D. Minn. 2023) (noting that "course of performance must cede to the express terms" if they cannot be reconciled); *cf. Caerus Corp. v. Icon Med., LLC*, No. 23-CV-2624, 2025 WL 1707839 (PJS/DLM), at *5 (D. Minn. June 18, 2025) (concluding that a

scattershot "history of 'pay whatever, whenever'" did not constitute a definite course of performance that could modify or supplement contract terms).

CPC undisputedly had the right under the Distributor Agreement to change its "published prices"—that is, the "retail" prices paid by end users. But NeoLogic is not protesting a change in the retail prices charged to end users; it is protesting a change in the *discount schedule* made available to NeoLogic. NeoLogic argues that the clause that gives CPC discretion to change "prices for [its] products" gives CPC the right to change a price *within* a discount schedule, but it does not give CPC the right to substitute the Cataloger discount schedule for the Distributor discount schedule. CPC, of course, disagrees.

The Court finds the Distributor Agreement to be ambiguous on this issue. CPC made the Distributor discount schedule available to NeoLogic for a decade. The course of performance between the parties suggests that they drew a sharp distinction between "price" and "discount." Indeed, a CPC general manager testified that "price is different than discount," *see* Bradford Decl. Ex. 1, Gerst Dep. at 26:1–5, and remarked in the course of switching NeoLogic from Distributor to Cataloger that "[w]e likely need to make [the] change through the channel agreement possibly," *see* Bradford Decl. Ex. 6.[13]

---

[13]Emails between employees for both parties reinforce this understanding. *E.g.*, Lemmetti Decl. Ex. 2 (discussing a "price increase *and* a discount schedule move," using separate headings for "last PO price" and "10K quote," and seeking "price approval" on (continued...)

CPC then attempted to get NeoLogic to sign a "New Cataloger Agreement." Gerst Decl. Ex. 6; Bradford Decl. Ex. 1, Gerst Dep. at 22:25–24:16. If CPC believed that it already had authority to change discount schedules under the existing agreement, it is difficult to understand why CPC worked so hard to get NeoLogic to sign a new agreement.

The Court finds, then, that a jury could reasonably conclude that (1) CPC's right to change "prices for CPC products," as contemplated by the parties in the Distributor Agreement, did not extend to changing the discount schedules; (2) the Distributor Agreement was otherwise silent regarding CPC's right to change discount schedules; and (3) the decade-long course of performance between the parties entitled NeoLogic to purchase products under the Distributor discount schedule. *See* Minn. Stat. § 336.2-202, U.C.C. cmt. 2 ("[T]he course of actual performance by the parties is considered the best indication of what they intended the record to mean."); *see also Glacial Plains Co-op. v. Chippewa Valley Ethanol Co.*, No. A10-869, 2011 WL 382710, at *5 (Minn. Ct. App. Feb. 8, 2011). Accordingly, NeoLogic may present its course-of-performance argument to a jury. *See Architectural Busstrut Corp. v. Target Corp.*, No. 19-CV-0968 (DSD/ECW), 2021 WL 5992309, at *6 (D. Minn. Nov. 17, 2021) (concluding that "the extent to which course of performance is relevant . . . is a question for the jury" when it could reflect either

---

[13](...continued)
specific volume-based quotes (emphasis added)).

contractually obligated or discretionary conduct); *Radiation Sys., Inc. v. Amplicon, Inc.*, 882 F. Supp. 1101, 1104 n.2 (D.D.C. 1995) ("Whether the parties' subsequent course of performance constituted an 'otherwise agreed upon' interpretation of [the contract]'s requirements is also a question of fact for the jury.").[14]

2. Post-Termination Returns

Both parties move for summary judgment on NeoLogic's breach-of-contract counterclaim regarding CPC's refusal to accept product returns from NeoLogic after CPC terminated the Distributor Agreement. NeoLogic contends that it had the right to return the products. CPC disagrees. As the Court explained at the hearing, the documents that govern the parties' transactions and the availability of post-termination returns— specifically, the Distributor Agreement, quotes, purchase orders, invoices, and terms and conditions of sale—are unclear and conflict in material respects. The Court therefore denies both motions, and a jury will decide this claim.

[14]CPC argues that any breach that it committed was justified by NeoLogic's abuse of the RFQ process and by other violations of NeoLogic's commitments to CPC. But these allegations rely on disputed facts and thus cannot be resolved on a motion for summary judgment. *Compare, e.g.*, Gerst Decl. ¶ 22, *with* Norvell Decl. ¶ 6, *and* Bradford Decl. Ex. 8.

3. Damages

CPC moves to exclude NeoLogic's damages expert Thomas Gorowsky and asks the Court to hold, as a matter of law, that NeoLogic cannot prove damages for any of its counterclaims. The motion is granted in part and denied in part.

The motion is denied with respect to alleged damages caused by CPC's refusal to accept post-termination returns. If CPC is held liable, a jury will need to resolve several factual disputes—not only disputes over the potential for or existence of additional mitigating sales, but also disputes over the applicable return fees, the holding costs, and the impact of any prior breaches—to determine NeoLogic's damages (or lack thereof) on this claim.

The motion is also denied as to pre-termination lost-profits damages. Gorowsky calculated the profits that NeoLogic lost from the time that CPC classified it as a Cataloger until CPC's termination of the Distributor Agreement. Harmon Decl. Ex. 22, Gorowsky Rep. at 13–15, Exs. 1, 2. NeoLogic's actual sales of CPC products during this period were $5,730,817. *Id.* Ex. 2-A. Gorowsky determined that, but for CPC's breaches, NeoLogic would have sold $7,774,659 of CPC products during this period. *Id.* at 14, Exs. 2, 2-A. Gorowsky applied NeoLogic's typical margin on CPC products to the difference (while subtracting incremental expenses), and calculated lost profits of $801,000. *Id.* at Ex. 1.

CPC argues that Gorowsky's opinion is unreliable because it accepts untested assumptions regarding growth and is irrelevant because it is too attenuated from the specific breaches alleged in NeoLogic's counterclaim. Upon close review, however, the Court finds, by a preponderance of the evidence, that Gorowsky's proposed testimony meets the criteria of Fed. R. Evid. 702 and therefore is admissible at trial. CPC's critiques are better left for cross-examination.

Finally, the motion to exclude is granted as to post-termination damages. NeoLogic essentially argues that it should recover profits that it would have earned *after* the termination of the Distributor Agreement because CPC would not have terminated the Distributor Agreement but for NeoLogic's nonpayment, and NeoLogic's nonpayment was justified. This "alternative history" theory is far too speculative to make it to a jury, especially because CPC unambiguously had the right to terminate the agreement at any time and for any reason. *See* Hearing Tr. at 16:19–18:11, 101:2–10; *Meterlogic, Inc. v. KLT, Inc.*, 368 F.3d 1017, 1019 (8th Cir. 2004) (affirming exclusion of future-lost-profit damages when the underlying contract was terminable at will). Thus, the Court will limit NeoLogic's damages—and Gorowsky's testimony—to the pre-termination period. *See Children's Broad. Corp. v. Walt Disney Co.*, 245 F.3d 1008, 1019 n.4 (8th Cir. 2001) ("When a breaching party has the power to terminate a contract upon

notice, the general rule is that the calculation of damages is limited to the notice period." (citations omitted)).

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1. CPC's motion for summary judgment and to exclude expert testimony [ECF No. 44] is GRANTED IN PART and DENIED IN PART as follows:

   a. Summary judgment is GRANTED on CPC's breach-of-contract claim. CPC is entitled to recover from NeoLogic damages in the amount of $1,664,127 and applicable prejudgment interest, plus reasonable attorney's fees pursuant to the Distributor Agreement and Fed. R. Civ. P. 54(d)(2).

   b. Summary judgment is GRANTED as to NeoLogic's counterclaims for breach of the implied covenant of good faith and fair dealing (Count II) and tortious interference with economic advantage (Count III), and these claims are DISMISSED WITH PREJUDICE AND ON THE MERITS.

c. The motion to exclude expert testimony is GRANTED IN PART AND DENIED IN PART. The Court GRANTS the motion insofar as it seeks exclusion of evidence regarding post-termination lost profits. The motion is DENIED in all other respects.

2. NeoLogic's motion for partial summary judgment [ECF No. 54] is DENIED.

Dated: August 31, 2026

/s/ Patrick J. Schiltz
Patrick J. Schiltz
United States District Judge